```
-----------------------------x
                              :
EUGENIO L. GALARZA            :    Civ. No. 3:18CV00126(SALM)
                              :
v.                            :
                              :
NANCY A. BERRYHILL,           :    February 11, 2019
ACTING COMMISSIONER, SOCIAL   :
SECURITY ADMINISTRATION       :
                              :
-----------------------------x
```

## RULING ON CROSS MOTIONS

Plaintiff, Eugenio L. Galarza, brings this appeal pursuant to §205(g) of the Social Security Act ("the Act"), as amended, seeking review of a final decision by the Acting Commissioner of the Social Security Administration (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff has moved for an order reversing the decision of the Commissioner, or in the alternative, for remand [Doc. #18]. Defendant has filed a motion for an order affirming the decision of the Commissioner [Doc. #20]. Plaintiff has filed a reply [Doc. #21].[1]

---

[1] Plaintiff's reply was filed on August 13, 2018. See Doc. #21. The supplemental scheduling order [Doc. #17] required that any reply brief be filed on or before August 7, 2018. The reply brief does not appear to raise any new arguments, and the Court has considered it to the extent that it clarifies and supports arguments advanced in plaintiff's motion to reverse or remand the decision of the Commissioner [Doc. #18].

For the reasons set forth below, plaintiff's Motion to Reverse or Remand **[Doc. #18]** is **DENIED**, and defendant's Motion for an Order Affirming the Decision of the Commissioner **[Doc. #20]** is **GRANTED**.

I.   **PROCEDURAL HISTORY**[2]

Plaintiff filed applications for DIB and SSI on February 19, 2015, alleging disability beginning May 1, 2011. See Certified Transcript of the Administrative Record, Doc. #16 and attachments, compiled on March 9, 2018, (hereinafter "Tr.") at 235-249. Plaintiff's applications were denied initially on October 1, 2015, see Tr. 95-96, and upon reconsideration on January 28, 2016, see Tr. 121-122.[3]

On June 1, 2017, plaintiff, represented by Attorney Howard B. Schiller, and with the aid of an interpreter, appeared and testified before Administrative Law Judge ("ALJ") Ryan A. Alger. See Tr. 41-53. Vocational Expert ("VE") Renee B. Jubrey testified by telephone at the hearing. See Tr. 60-64. Delores Cardona also testified. See Tr. 53-60. Plaintiff resides with Ms. Cardona, the mother of his sixteen-year-old twins. See Tr. 50. On June 28, 2017, the ALJ issued an unfavorable decision.

---

[2] Plaintiff filed a stipulation of facts which has been adopted by both parties. See Doc. #19.

[3] The ALJ's decision erroneously lists the initial denial date as October 6, 2015, and the denial date upon reconsideration as January 29, 2016. See Tr. 29.

See Tr. 15-38. On December 13, 2017, the Appeals Council denied plaintiff's request for review, making the ALJ's June 28, 2017, decision the final decision of the Commissioner. See Tr. 1-8. The case is now ripe for review under 42 U.S.C. §405(g).

## II. <u>STANDARD OF REVIEW</u>

The review of a Social Security disability determination involves two levels of inquiry. <u>First</u>, the court must decide whether the Commissioner applied the correct legal principles in making the determination. See <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998). <u>Second</u>, the court must decide whether the determination is supported by substantial evidence. See <u>id.</u> Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). The reviewing court's responsibility is to ensure that a claim has been fairly evaluated by the ALJ. See <u>Grey v. Heckler</u>, 721 F.2d 41, 46 (2d Cir. 1983).

The Court does not reach the second stage of review – evaluating whether substantial evidence supports the ALJ's conclusion – if the Court determines that the ALJ failed to apply the law correctly. See <u>Norman v. Astrue</u>, 912 F. Supp. 2d 33, 70 (S.D.N.Y. 2012) ("The Court first reviews the Commissioner's decision for compliance with the correct legal

standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence."). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have [his] disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). The ALJ is free to accept or reject the testimony of any witness, but a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988). It is well established that "an ALJ's credibility determination is generally entitled to deference on appeal." Selian v. Astrue, 708 F.3d 409, 420 (2d Cir. 2013); see also Kessler v. Colvin, 48 F. Supp. 3d 578, 595 (S.D.N.Y. 2014) ("A federal court must afford great deference to the ALJ's credibility finding, since the ALJ had the opportunity to observe the claimant's demeanor

while the claimant was testifying." (citation and internal quotation marks omitted)); <u>Pietrunti v. Dir., Office of Workers' Comp. Programs</u>, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." (citation and internal quotation marks omitted)).

It is important to note that in reviewing the ALJ's decision, this Court's role is not to start from scratch. "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012). **"[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports <u>the ALJ's decision</u>**." <u>Bonet ex rel. T.B. v. Colvin</u>, 523 F. App'x 58, 59 (2d Cir. 2013).

## III. <u>SSA LEGAL STANDARD</u>

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. §423(a)(1).

To be considered disabled under the Act and therefore entitled to benefits, plaintiff must demonstrate that she is unable to work after a date specified "by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Such impairment or impairments must be "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); see also 20 C.F.R. §404.1520(c) (requiring that the impairment "significantly limit[] ... physical or mental ability to do basic work activities[]" to be considered "severe").[4]

There is a familiar five-step analysis used to determine if a person is disabled. See 20 C.F.R. §404.1520. In the Second Circuit, the test is described as follows:

---

[4] Some of the Regulations cited in this decision, particularly those applicable to the review of medical source evidence, were amended effective March 27, 2017. Those "new regulations apply only to claims filed on or after March 27, 2017." Smith v. Comm'r, 731 F. App'x 28, 30 n.1 (2d Cir. 2018) (summary order). Where a plaintiff's claim for benefits was filed prior to March 27, 2017, "the Court reviews the ALJ's decision under the earlier regulations[.]" Rodriguez v. Colvin, No. 3:15CV1723(DFM), 2018 WL 4204436, at *4 n.6 (D. Conn. Sept. 4, 2018); White v. Comm'r, No. 17CV4524(JS), 2018 WL 4783974, at *4 (E.D.N.Y. Sept. 30, 2018) ("While the Act was amended effective March 27, 2017, the Court reviews the ALJ's decision under the earlier regulations because the Plaintiff's application was filed before the new regulations went into effect." (citation omitted)).

First, the Secretary considers whether the claimant is
currently engaged in substantial gainful activity. If
[she] is not, the Secretary next considers whether the
claimant has a "severe impairment" which significantly
limits [her] physical or mental ability to do basic work
activities. If the claimant suffers such an impairment,
the third inquiry is whether, based solely on medical
evidence, the claimant has an impairment which is listed
in Appendix 1 of the regulations. If the claimant has
such an impairment, the Secretary will consider [her]
disabled without considering vocational factors such as
age, education, and work experience; the Secretary
presumes that a claimant who is afflicted with a "listed"
impairment is unable to perform substantial gainful
activity.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per

curiam). If and only if the claimant does not have a listed

impairment, the Commissioner engages in the fourth and fifth

steps:

Assuming the claimant does not have a listed impairment,
the fourth inquiry is whether, despite the claimant's
severe impairment, [she] has the residual functional
capacity to perform [her] past work. Finally, if the
claimant is unable to perform [her] past work, the
Secretary then determines whether there is other work
which the claimant could perform. Under the cases
previously discussed, the claimant bears the burden of
proof as to the first four steps, while the Secretary
must prove the final one.

Id.

"Through the fourth step, the claimant carries the burdens

of production and persuasion, but if the analysis proceeds to

the fifth step, there is a limited shift in the burden of proof

and the Commissioner is obligated to demonstrate that jobs exist

in the national or local economies that the claimant can perform

given [her] residual functional capacity." Gonzalez ex rel.

Guzman v. Dep't of Health and Human Serv., 360 F. App'x 240, 243 (2d Cir. 2010) (citing 68 Fed. Reg. 51155 (Aug. 26, 2003)); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam)). "Residual functional capacity" ("RFC") is what a person is still capable of doing despite limitations resulting from her physical and mental impairments. See 20 C.F.R. §404.1545(a)(1).

"In assessing disability, factors to be considered are (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978). "[E]ligibility for benefits is to be determined in light of the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied." Id. (citation and internal quotation marks omitted).

## IV. **THE ALJ'S DECSION**

Following the above-described five-step evaluation process, the ALJ concluded that plaintiff was not disabled under the Act. See Tr. 31. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of May 1, 2011. See Tr. 23. At step two, the ALJ found that plaintiff had the severe impairments of "degenerative disc

8

disease of the lumbar spine, bilateral shoulder arthritis, [and] status post rotator cuff repair[.]" Id.

At step three, the ALJ found that plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. See Tr. 24. The ALJ specifically considered Listings 1.00 (Musculoskeletal System), 1.02 (Major dysfunction of a joint(s) (due to any cause)), and 1.04 (Disorders of the spine). See Tr. 24. Before moving on to step four, the ALJ found plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can frequently climb stairs and ramps; cannot climb ladders, ropes, or scaffolds; occasionally kneel; cannot crawl; cannot perform overhead work bilaterally; and can occasionally push and pull bilaterally.

Id.

At step four, the ALJ concluded that plaintiff had no past relevant work. See Tr. 29. Before moving on to step five, the ALJ found that plaintiff "is illiterate and is able to communicate in English[.]" Tr. 29. At step five, and after considering the testimony of the VE as well as plaintiff's age, education, work experience, and RFC, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform. See Tr. 30.

## V.   <u>**DISCUSSION**</u>

Plaintiff asserts that the ALJ erred:

1. at step two by failing to assess plaintiff's vascular impairment and failing to classify it as severe;

2. at step three by concluding that plaintiff's impairments did not meet Listing 1.04;

3. by not appropriately weighing the evidence when determining plaintiff's RFC; and

4. at step five by not adequately considering plaintiff's illiteracy when determining what jobs plaintiff could perform.

The Court addresses each argument in turn.

### A. Step Two: Consideration of Vascular Condition

Plaintiff contends that the ALJ erred at step two by not discussing plaintiff's "lower extremity vascular condition[,]" Doc. #18 at 9, and, thus, implicitly determining that it was not a severe impairment. See Doc. #18 at 8-10; Doc. #21 at 1-6. The Commissioner argues that plaintiff did not meet his burden to "show that the impairment was both medically determinable and severe[,]" and has not established that any alleged error was harmful. Doc. #20-1 at 3; see id. at 5.

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has an impairment or combination of impairments "of such severity" that it "significantly limits [his] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§404.1520(c), 416.920(c).

At this step, "then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities." Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *4 (S.S.A. Jan. 1, 1985). Examples of "basic work activities" include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§404.1521(b)(1)-(6), 416.921(b)(1)-(6).

Step two, the Second Circuit has held, is limited to "screen[ing] out de minimis claims[.]" Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). However, "[t]he presence of an impairment is ... not in and of itself disabling within the meaning of the Act." Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995). Plaintiff bears the burden at step two of showing that his medical impairments are severe. See Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); 20 C.F.R. §§404.1512(a), 416.912(a).

Plaintiff claims that his documented claudication and "bilateral lower extremity circulation deficits[]" should have been discussed, and found to be severe, by the ALJ. Doc. #18 at

9; see also Doc. #21 at 1-6. These conditions appear to constitute the "Peripheral Vascular (Arterial) Disease" that Dr. Sandell, a state agency medical consultant, found to be severe. Tr. 103, 115. Plaintiff points to two sources of information related to his vascular condition, and contends that the "lower extremity circulatory issues would have a synergistic impact upon his ability to stand and walk when coupled with the discogenic issues affecting his legs." Doc. #21 at 4.[5]

The first records addressing symptoms related to a vascular condition date to a September 25, 2015, visit to Windham Hospital, where plaintiff presented with "sharp chest pains[.]" Tr. 521. Plaintiff points to records from that visit stating that he had a "hemodynamically significant pressure gradient consistent with right femoropopliteal arterial disease[,]" and "hemodynamically significant contralateral pressure gradient consistent with left femoral arterial disease." Tr. 518. These records also state that plaintiff has "risk factors for peripheral vascular disease including tobacco use. The patient presents with chest pain and bilateral lower extremity claudication symptoms." Id. (emphasis added). Although the staff at Windham Hospital reached their conclusions after plaintiff

---

[5] Plaintiff also contends that failure to adequately discuss the vascular condition undermines the ALJ's RFC determination, discussed infra.

ran on a treadmill, see Tr. 518, and were aware of plaintiff's lower back pain, see Tr. 520-21, plaintiff was sent home from Windham Hospital without any restrictions related to mobility or exertion, see Tr. 522 ("Discharge Activity: None[;] Additional Discharge Instructions: out patient stress test, ;use vicodin for pain[.]" (sic)).

Plaintiff was seen at Generations Family Medical Center on October 22, 2015, at which time he "reported that he had developed chest pain after having an argument with his orthopedic surgeon. A stress test had shown bilateral peripheral artery disease." Doc. #19 at 15. Plaintiff makes no reference to this visit in his motion. These records state that plaintiff's symptoms were "relieved by rest[.]" Tr. 547. With regard to cardiovascular symptoms, these records document only "[c]hest pain or discomfort[.]" Tr. 548. This visit, similarly, did not result in any exertional restrictions; plaintiff was advised to maintain a healthy diet and lose weight. See Tr. 549.

When summarizing these two medical records in his "Key Somatic Findings[,]" Dr. Sandell noted "PAD[,]" and concluded that plaintiff's "Peripheral Vascular (Arterial) Disease[,]" was a severe impairment. Tr. 102-103; 114-15. Dr. Sandell is a state agency medical consultant who has never examined or treated plaintiff. See Tr. 103-04; 115-16; Doc. #19 at 2.

13

After identifying those of plaintiff's conditions he considered "severe[,]" Dr. Sandell assessed plaintiff's exertional limitations. Tr. 103, 115; see also Tr. 104, 116. Dr. Sandell opined that plaintiff could not lift more than ten pounds, and could only stand and/or walk with normal breaks for two hours in an eight hour workday. See Tr. 103-04, 115-16. When asked to provide evidence in support of his conclusions, Dr. Sandell wrote that plaintiff could only lift five to seven pounds frequently, but failed to provide any specific diagnostic basis for these exertional restrictions. See Tr. 104, 116. When Dr. Sandell evaluated plaintiff's environmental limitations, he opined that plaintiff should avoid concentrated exposure to extreme cold. See Tr. 105; 117. When asked to explain that limitation and to provide evidence for that conclusion, he stated "PAD[.]" Id.

Despite Dr. Sandell's classification of the vascular condition as severe, plaintiff points to no evidence that he sought ongoing care for the condition, or that any of his treating physicians considered the condition in his ongoing treatment. Plaintiff acknowledges that none of his treating providers were aware of the condition. See Doc. #21 at 2. Only six sentences are devoted to discussion of the condition in the parties' fifteen-page stipulation of facts. See Doc. #19 at 15. Plaintiff did not discuss this condition in his testimony at the

hearing. See Tr. 7-16. These factors weigh against a claim of error at step two. See, e.g, Corbit v. Colvin, No. 3:13CV01587(JBA), 2015 WL 9308221, at *4 (D. Conn. Dec. 22, 2015) (no error where ALJ did not discuss a condition that was mentioned in the introduction to a single physician's evaluation but was "not discussed anywhere else in [claimant's] evaluation, or in any other doctor's evaluation, nor in the testimony given at the hearing[,]" and there was no evidence indicating that "medical professionals had diagnosed the plaintiff with specific impairments which were later omitted from the disability analysis[]").

Additionally, plaintiff points to no exertional limitation tied to this condition imposed by any physician, and none is apparent from the record. While remand may be appropriate where there is evidence to suggest that significant functional limitations were ignored in the ALJ's evaluation, see, e.g., Garcia v. Colvin, 3:14CV01840(VLB)(RAR) (D. Conn. 2017), that did not occur here. Even Dr. Sandell did not discuss this condition in conjunction with plaintiff's exertional restrictions -- only when discussing exposure to extreme cold, an environmental restriction, which is consistent with the nature of the condition. See, e.g, Malloy v. Astrue, No. 3:10CV00190(MRK)(WIG), 2010 WL 7865083, at *14-15 (D. Conn. Nov. 17, 2010) (no error at step two where an ALJ failed to discuss a

15

condition <u>without</u> medically supported limitations; error at step two for failure to consider a condition where the record evinced "<u>significant evidence</u> of <u>extreme deficits</u>" (emphases in original)). "An impairment must be established by medical evidence consisting of signs, <u>symptoms</u>, <u>and</u> laboratory findings."[6] <u>Corbit</u>, 2015 WL 9308221, at *4 (emphases added); <u>see also</u> 20 C.F.R. §§404.1528, 404.1594, 404.1594, 416.908, 416.912, 416.928.

Plaintiff has failed to sustain his burden of showing at step two that his vascular condition "significantly limited his physical ... ability to do basic work activities[.]" 20 C.F.R. §§404.1520(c), 416.920(c). The Court finds that there is

---

[6] Symptoms, signs and laboratory findings are defined as follows:

> (a) Symptoms are your own description of your physical or mental impairment. ... <u>Your statements (or those of another person) alone, however, are not enough to establish that there is a physical or mental impairment.</u>
> (b) Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). <u>Signs must be shown by medically acceptable clinical diagnostic techniques. ... They must also be shown by observable facts that can be medically described and evaluated.</u>
> (c) Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of a medically acceptable laboratory diagnostic techniques.

20 C.F.R. §§404.1528, 416.928 (emphases added).

substantial evidence in the record to support the ALJ's implicit
determination that the vascular condition was non-severe.[7]

**B. Step Three: Listing 1.04 (Disorders of the Spine)**

Plaintiff argues that the ALJ wrongfully concluded that he
did not meet Listing 1.04. See Doc. #18 at 3-4. The Commissioner
disagrees. See Doc. #20-1 at 5-8.

Specifically, plaintiff points to evidence related to
positive straight leg raising tests, which he contends were
ignored by the ALJ. See Doc. #18 at 3-5. Listing 1.04 requires:

> A. Evidence of nerve root compression characterized by
> neuro-anatomic distribution of pain, limitation of
> motion of the spine, motor loss (atrophy with associated
> muscle weakness or muscle weakness) accompanied by
> sensory or reflex loss and, if there is involvement of
> the lower back, positive straight-leg raising test
> (sitting and supine);
>
> B. Spinal arachnoiditis; or
>
> C. Lumbar spinal stenosis resulting in
> pseudoclaudication.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 §1.04 (emphases added).

Straight leg raising tests are one element of the test
under Listing 1.04(A). See id. Plaintiff points to positive
straight leg raising tests, see Tr. 365; 514; 795, and argues

---

[7] As discussed infra, the ALJ had a duty to evaluate both severe
and non-severe conditions when determining plaintiff's RFC. See
Stanton v. Astrue, 370 F. App'x 231, 233 n.1 (2d Cir. 2010)
(summary order) (Potential error at step two is harmless if the
potential non-severe impairment and functional limitations are
considered in subsequent steps.). As discussed below, the ALJ's
determination of plaintiff's RFC was also appropriate.

that intermittent positive tests are consistent with meeting Listing 1.04. See Doc. #18 at 3.

Plaintiff's arguments are unpersuasive. First, the ALJ did acknowledge that plaintiff had intermittent positive straight leg raising tests. See Tr. 26. Second,

> [a]lthough the record indicates that plaintiff had positive straight leg tests, the record fails to establish that the positive straight leg raising was in both the seated and supine positions. For these reasons, plaintiff has failed to meet [his] burden of showing that [his] back impairment meets Listing 1.04(A).

Wages v. Astrue, No. 3:11CV01571(JCH)(HBF), 2013 WL 3243133, at *13 (D. Conn. Mar. 26, 2013) (citation omitted), recommended ruling rejected in part on other grounds sub nom, Wages v. Comm'r of Soc. Sec., 2013 WL 3243116, at *5 (D. Conn. June 26, 2013). Plaintiff acknowledges that the record does not contain the required evidence regarding straight leg raising tests. See Doc. #21 at 6.

The ALJ supported his conclusion that plaintiff's conditions neither met nor were equivalent to Listing 1.04 with citations to "Exhibit 7F at 33, 38; 26F at 1-4; 28F at 1; 36F at 1[.]" Tr. 24. While plaintiff focuses only on the references in these records to straight leg raising tests (or the lack thereof), these records addressed a variety of factors outlined in Listing 1.04, including "good strength and sensation to both lower extremities[,]" Tr. 493; lack of stenosis, see Tr. 337-38;

18

762; and normal range of motion, <u>see</u> Tr. 802. These records provide substantial evidence to support the ALJ's finding.

## C. RFC: Standing and Walking

Plaintiff's RFC is "the most [he] can still do despite [his] limitations." 20 C.F.R. §§404.1545(a)(1), 416.945(a)(1). The RFC is assessed "based on all the relevant evidence in [the] case record[,]" including "all of the relevant medical and other evidence." 20 C.F.R. §§404.1545(a)(1), (3), 416.945(a)(1), (3). The ALJ concluded that plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can frequently climb stairs and ramps; cannot climb ladders, ropes, or scaffolds; occasionally kneel; cannot crawl; cannot perform overhead work bilaterally; and can occasionally push and pull bilaterally.

Tr. 24. A position qualifies as light work when

> it <u>requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs.</u> ... Relatively few unskilled light jobs are performed in a seated position.
>
> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, <u>the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.</u> Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, <u>with the ability to stand being more critical than the ability to walk.</u>

SSR 83-10, 1983 WL 31251, at *5-6 (S.S.A. 1983) (emphases added). In comparison, sedentary work requires standing or walking for no more than two hours of an eight-hour work day. See id. at 5.

Plaintiff's principle contention is that he is incapable of walking for six hours in an eight-hour day. Plaintiff advances numerous arguments in support of this contention. See, generally, Doc. #18; Doc. #21. The Commissioner argues that the ALJ's findings were supported by substantial evidence, and the ALJ's assignment of weight to evidence was consistent with applicable law. See Doc. #20-1 at 8-16. The Court addresses each of plaintiff's arguments in turn.

    1. Medical Evidence

Plaintiff argues that "[i]n evaluating the opinions of treating physicians particularly, the ALJ is obligated to give 'good reasons' for the [less than controlling] weight accorded treating physicians' opinions. ... To the extent that there was no medical opinion contradicting the opinions of Mr. Galarza's treating physicians, their expressed opinions are controlling." Doc. #18 at 7. Plaintiff further argues that "ALJ Alger should have sought clarification from Mr. Galarza's treating physicians prior to rejecting their opinions regarding functional abilities." Doc. #18 at 7.

i. Applicable Law, Generally

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa v. Callahan, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (citation and quotation marks omitted). The duty to further develop the record is triggered "only if the evidence before [the ALJ] is inadequate to determine whether the plaintiff is disabled." Walsh v. Colvin, No. 3:13CV00687(JAM), 2016 WL 1626817, at *2 (D. Conn. Apr. 25, 2016) (citation and quotation marks omitted).

Once a record is fully developed, the ALJ evaluates the medical opinions of the physicians who treated plaintiff as follows:

> With respect to the nature and severity of a claimant's impairment(s), the SSA recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.] According to this rule, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.

Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citations and quotation marks omitted) (emphasis added).

When weighing any medical opinion, the Regulations require that the ALJ consider the following factors: length of treatment relationship; frequency of examination; nature and extent of the treatment relationship; relevant evidence used to support the opinion; consistency of the opinion with the entire record; and the expertise and specialized knowledge of the source. See 20 C.F.R. §§404.1527(c)(2)-(6), 416.927(c)(2)-(6). The Second Circuit does not, however, require a "slavish recitation of each and every factor [of 20 C.F.R. §404.1527(c) and §416.927(c)] where the ALJ's reasoning and adherence to the regulation are clear." Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013).

Plaintiff argues that the ALJ erred in not imposing the sedentary restrictions detailed in reports written by two medical professionals: Dr. Arciero, who is a treating physician, and Dr. Sandell, who is not. See generally Doc. #18. Plaintiff also asserts that the ALJ erred in not seeking "clarification from [plaintiff's] treating physicians prior to rejecting their opinions regarding functional abilities." Doc. #18 at 7.

ii. Dr. Scarangella and Dr. Pasha

Before discussing the reports relied upon by plaintiff, the Court pauses to outline the opinions provided by Dr. Scarangella and Dr. Pasha -- which the ALJ did credit with regard to

22

standing and walking. See Tr. 28. The opinions of both of these providers are subject to the treating physician rule. That is, the ALJ should give them controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in the case record." Burgess, 537 F.3d at 128 (citations and quotation marks omitted).

Dr. Scarangella, one of plaintiff's treating orthopedists, placed no restrictions on plaintiff's walking or standing. See, e.g., Tr. 375, 380, 405, 743-48. Dr. Pasha, who treated plaintiff's back, wrote numerous detailed evaluations of plaintiff's condition, including his leg pain, but did not place any restrictions on plaintiff's time walking or standing. See, e.g., Tr. 501, 729-34, 762-65, 811-20. Dr. Pasha continually declined to place such restrictions on plaintiff, even when plaintiff repeatedly complained of an inability to walk for prolonged periods. See, e.g., Tr. 501, 729-34, 762-65. Dr. Pasha did classify plaintiff, many times over the course of years, as being only capable of some form of light duty work; Dr. Pasha made clear, however, that the restrictions he placed on plaintiff were related to the weight he could carry, not his mobility. See, e.g., Tr. 501, 729-34, 762-65, 811-20. Dr. Pasha expressly opined that plaintiff could sit, stand, and walk for eight hours a day as recently as 2017. See Tr. 813.

iii. Dr. Arciero

Plaintiff cites to restrictions proposed by Dr. Arciero, who treated plaintiff for his shoulder injuries. Dr. Arciero is a treating physician, and his opinions are entitled to controlling weight if they are "not inconsistent with the other substantial evidence in the case record." Burgess, 537 F.3d at 128 (citation and quotation marks omitted). If the opinions are not entitled to controlling weight, the ALJ considers the factors established in 20 C.F.R. §404.1527(c)(2)-(6) and §416.927(c)(2)-(6) in determining the appropriate weight to assign the opinions.

Dr. Arciero issued only one opinion that specifically addressed plaintiff's ability to walk or stand.[8] On March 28, 2017, Dr. Arciero completed a check-box form, indicating that plaintiff could stand for only four hours, and walk for only two hours. See Tr. 767. Check-box forms are "weak evidence at best[,]" and are "only marginally useful for purposes of

---

[8] Dr. Arciero suggested a need for sedentary restrictions in one other report. That report, dated May 16, 2017, states: "Sedentary job only, No lifting more than 15 lbs. No overhead work, job that requires reclining for prolonged periods." Tr. 821. There, Dr. Arciero stated that the body part assessed was plaintiff's right shoulder. See id. The form Dr. Arciero filled out stated "IMPORTANT! Use a separate Form 42 for EACH body part!" Id. Plaintiff provides no support for the proposition that this restriction to sedentary work relates to plaintiff's ability to walk or stand. The report is discussed in greater detail as it relates to plaintiff's ability to lift, infra.

creating a meaningful and reviewable factual record. Such form reports provide little reason to afford much weight to a treating physician's opinion."[9] <u>Cote v. Berryhill</u>, No. 3:17CV01843(SALM), 2018 WL 4092068, at *14 (D. Conn. Aug. 28, 2018) (citations and quotation marks omitted) (collecting cases).

In addition, this report was <u>not</u> accompanied by any physical examination of plaintiff relating to his ability to walk.[10] <u>See</u> Tr. 767. The form only indicates a need for sedentary restrictions, as plaintiff asserts, <u>if interpreted</u> to mean that the plaintiff can spend only four hours upright in total, <u>i.e.</u>, that the hours spent walking should be included in the hours spent standing. The ALJ discounted these restrictions as they were inconsistent with medical evidence in the record as well as the plaintiff's self-reported ability to walk half a mile at a time. <u>See</u> Tr. 29.

---

[9] Although Dr. Pasha also utilized check-box forms, those forms were accompanied by detailed notes and evaluations of the plaintiff, which supported the restrictions detailed on the forms. <u>See</u>, <u>e.g.</u>, Tr. 729-34, 762-65.

[10] Although the form states that Dr. Arciero determined, through physical examination and an MRI, that plaintiff had pain and various impediments related to his shoulder, rotator cuff, and biceps, it does not discuss any examination of plaintiff's legs or back. <u>See</u> Tr. 766. Dr. Arciero provided no documentation or notes with the form supporting or explaining the restrictions related to walking and standing.

Even if the Court proceeds under the assumption that the report indicated plaintiff could only spend four hours per workday upright,[11] Dr. Arciero's opinion is not entitled to controlling weight. The many opinions of Dr. Scarangella and Dr. Pasha are substantial evidence in the case record that conflict with the single, unsupported, report of Dr. Arciero. The ALJ therefore did not err in assigning less than controlling weight to Dr. Arciero's "opinions with regard to standing and walking[.]" Tr. 29.

Furthermore, the factors outlined in 20 C.F.R. §404.1527(c)(2)-(6) and §416.927(c)(2)-(6), as considered by the ALJ, do not support adoption of Dr. Arciero's opinion related to walking and standing. As to specialization, Dr. Arciero is an Orthopedic Surgeon. See Tr. 26 (citing Tr. 628-30, 797-98). As to the nature of the treatment relationship, Dr. Arciero treated plaintiff for his shoulder, not his back or legs. The ALJ

---

[11] The Second Circuit has held that, where a physician's report does not otherwise specify if the hours spent standing and walking are to be viewed inclusively or separately, and where no other functional assessment of a claimant has been done, that the "hours of walking must be included in the [] hours of standing, not added to it." Vargas v. Sullivan, 898 F.2d 293, 295 (2d Cir. 1990). While Dr. Arciero's report does not necessarily lend itself to such construction because it expressly contemplates that the hours will be added together, see Tr. 767, the Court need not address the issue further because plaintiff's argument fails even under the interpretation he proposes.

implicitly acknowledged this, both when he generally credited Dr. Arciero's opinions with regard to "lifting, reaching, and pushing and pulling[,]" Tr. 29, and when he cited to the reports of Dr. Arciero in his discussion of plaintiff's history of shoulder treatment, but not in his discussion of treatment for plaintiff's back and legs, see Tr. 26.

Similarly, plaintiff's single sentence argument that the ALJ "should have sought clarification from [Dr. Arciero] prior to rejecting [his] opinions regarding functional abilities[,]" Doc. #18 at 7, is unpersuasive. Although Dr. Arciero is a treating physician, this case merely required the ALJ to perform the ordinary function of weighing various records containing minor deviations against the record as a whole, and to make determinations regarding the appropriate weight to ascribe to individual pieces of evidence. See Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012) ("[W]e defer to the Commissioner's resolution of conflicting evidence."); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). No further development of the record was required in this case, and plaintiff has not met his burden to demonstrate otherwise. See Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("The burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

The ALJ did not commit reversible error when he did not adopt the restrictions imposed by Dr. Arciero.

### iv. Dr. Sandell

Plaintiff next urges adoption of restrictions outlined in the two reports[12] of Dr. Sandell, a state agency medical consultant who "reviewed the claimant's records on Jan. 28, 2016, upon reconsideration and concluded ... [that plaintiff] could stand or walk no more than two hours in an eight hour day[.]" Doc. #19 at 2; see also Tr. 103-04, 115-16. Plaintiff argues that it was improper for the ALJ to discount Dr. Sandell's opinion, and to decline to apply the restrictions Dr. Sandell suggested because Dr. Sandell, unlike plaintiff's treating physicians, was aware of plaintiff's vascular condition. See Doc. #18 at 6-7; Doc. #21 at 1-2. Plaintiff further argues, relying exclusively on Dr. Sandell's opinion for support, that the ALJ's failure to expressly discuss plaintiff's vascular condition when the ALJ made his RFC determination constitutes reversible error. See Doc. #18 at 9; Doc. #21 at 3-5, 7.

---

[12] Because plaintiff applied for both SSI and DIB benefits, two reports were generated at the state reconsideration level. See Tr. 97-108 (DIB), 109-120 (SSI, noted as "DI" in the report). The substantive content of these reports, including the opinions of Dr. Sandell expressed therein, are identical. See id.

Dr. Sandell's opinion, because it is the opinion of a "reviewing state agency medical consultant[,]" rather than one of a treating physician, is "insufficient to outweigh the opinion of a treating physician who cared for the plaintiff over a period of time and who provided an opinion supported by explanation and treatment records." Wages v. Comm'r of Soc. Sec., No. 3:11CV01571(JCH), 2013 WL 3243116, at *2 (D. Conn. June 26, 2013) (citation and quotation marks omitted).

Dr. Sandell's opinion is therefore evaluated under the factors outlined in 20 C.F.R. §404.1527(c)(2)-(6) and §416.927(c)(2)-(6). There was no treatment relationship between Dr. Sandell and plaintiff. Additionally, as the ALJ points out, Dr. Sandell did not have "the benefit of additional evidence submitted at the hearing level[,]" i.e., all records of treatment submitted after January 28, 2016, which is when Dr. Sandell evaluated plaintiff's records. Tr. 27. Plaintiff acknowledges that Dr. Sandell's opinion regarding his abilities was anomalous when compared to the records and opinions of his treating physicians. See Doc. #21 at 1 ("Dr. Sandell provided more restrictive limitations than other physicians[.]").

Plaintiff argues that it was error for the ALJ to rely on the opinions of other physicians to discount the limitations imposed by Dr. Sandell because those physicians were unaware of plaintiff's vascular condition. See Doc. #18 at 9-10; Doc. #21

at 1-4. Plaintiff contends that his "lower extremity circulatory issues would have a synergistic impact upon his ability to stand and walk when coupled with the discogenic issues affecting his legs." Doc. #21 at 4. Plaintiff then argues that "[t]here was no other medical opinion regarding plaintiff's peripheral arterial disease[]" and the ALJ was "not free to set his own expertise against that of a physician who submitted an opinion[;]" therefore, plaintiff concludes, the ALJ had no choice but to adopt the restrictions outlined by Dr. Sandell. Doc. #21 at 4 (citations and quotation marks omitted). The Court disagrees with plaintiff's conclusions and finds that substantial evidence supports the ALJ's RFC determination with respect to standing and walking, even though the ALJ did not expressly discuss plaintiff's vascular condition.

As discussed above, the record contains three pieces of evidence related to the vascular condition: (1) the records of Windham Hospital, containing test results and a notation that plaintiff had claudication and risk factors for peripheral vascular (arterial) disease, see Tr. 517-523; (2) the records from Generations Family Medical Center from October 22, 2015, when plaintiff complained of chest pains following an argument with his physician, see Doc. #19 at 15; and (3) Dr. Sandell's reports, see Tr. 103-104; 115-116. Neither the records from Generations Family Medical Center nor the records from Windham

Hospital document <u>any</u> functional limitations of any kind, although the physicians at Windham Hospital were aware of plaintiff's complaints related to walking and back pain, <u>see</u> Tr. 517-523.

Furthermore, Plaintiff relies on speculation alone to assert that the vascular condition was even a factor in Dr. Sandell's determination of plaintiff's <u>exertional</u> limitations.[13] Plaintiff's central argument is that there is substantial evidence to support the conclusion that he can only perform work at the sedentary level. What plaintiff fails to appreciate is that "whether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision." <u>Bonet ex rel. T.B.</u>, 523 F. App'x at 59.

While the ALJ was required to consider all of plaintiff's <u>limitations</u> flowing from severe <u>or</u> non-severe conditions in determining plaintiff's RFC, <u>see</u> 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2), the record does not contain <u>any</u> evidence of an exertional <u>limitation</u> attributable to plaintiff's vascular condition. The ALJ therefore did not commit reversible error in not discussing any evidence related to plaintiff's alleged

---

[13] Plaintiff does not allege that the ALJ erred by failing to adopt Dr. Sandell's suggested environmental limitation, avoidance of extreme cold, in the RFC.

vascular condition before crediting Dr. Pasha's and Dr. Scarangella's assessments and the record as a whole with regard to plaintiff's ability to walk. Nor did the ALJ err in crediting those assessments over the questionably relevant and unsupported reports of Dr. Sandell and Dr. Arciero. To use the language of 20 C.F.R. §404.1527(c)(2)-(6) and §416.927(c)(2)-(6), the reports relied on by plaintiff lacked both supportability and consistency.

### 2. Observations by Non-Medical Sources

Plaintiff contends that the ALJ gave insufficient weight to the testimony of Delores Cardona, and failed to properly consider a report by an employee of the Social Security Administration ("SSA"), each of which provided support for the contention that plaintiff had difficulty walking. See Doc. #18 at 10-12. The Commissioner argues that the ALJ appropriately weighed Ms. Cardona's testimony, and that the failure to discuss the report of the SSA employee was, "at most, harmless error." Doc. #20-1 at 15; see id. at 16.

### i. Applicable Law, Generally

The Regulations direct ALJs to consider "observations by ... other persons[]" when evaluating the intensity and persistence of plaintiff's symptoms. 20 C.F.R. §§404.1529(c)(3), 416.929(c)(3). "SSR 06-03p states that in considering evidence from non-medical sources, such as 'spouses, parents, and

friends,' it is appropriate to consider the nature and extent of the relationship, 'whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.'" Werts v. Comm'r of Soc. Sec., No. 5:13CV00914(LEK), 2014 WL 6078434, at *13 (N.D.N.Y. Nov. 13, 2014) (quoting SSR 06-03p, 2006 WL 2329939, at 2 (S.S.A. Aug. 9, 2006)).

### ii. Delores Cardona

Ms. Cardona is the mother of plaintiff's two sixteen-year-old children, and they all live together. See Tr. 29, 50. Plaintiff described himself as having a "family relationship" with Ms. Cardona, although they are not married. Tr. 50. The ALJ gave Ms. Cardona's opinions partial weight because "she is not a medical source, and did not provide a functional assessment of the claimant." Tr. 29.

Ms. Cardona's testimony, which consisted of describing limitations plaintiff experiences in daily activities, see Tr. 54-60, may have been consistent with plaintiff's accounts, but does not override the contradictory opinions of medical sources. "Consideration of such lay testimony is not a substitute for proper consideration of a treating physician's medical opinion." See Greek v. Colvin, 802 F.3d 370, 376 (2d Cir. 2015).

Ms. Cardona testified regarding plaintiff's difficulty walking, moving his arms behind his back, and general discomfort

while moving. See, generally, Tr. 54-60. Plaintiff made similar statements to his physicians, and those physicians did not impose the restrictions plaintiff seeks. See, e.g., Tr. 501, 729-34, 762-65, 811-20. While use of the phrase "functional assessment" may be unusual when describing the testimony of a lay witness, the ALJ did not misapply SSR 06-03p in evaluating Ms. Cardona's credibility, and his determination of the weight to give her testimony was supported by substantial evidence.

### iii. SSA Employee

Next, plaintiff points to the report filed by J. Jennett, an employee of the SSA with whom plaintiff had a face-to-face meeting on April 27, 2015. See Doc. #18 at 10; Tr. 238. The report stated that plaintiff "appeared uncomfortable walking in and several times he had to shift in his seat[.]" Tr. 283. The Commissioner argues that the failure to discuss this report is "at most, harmless error." Doc. #20-1 at 15. The Commissioner also notes that another SSA employee, L. Perez, observed plaintiff on November 17, 2015, and noted that plaintiff had no difficulty walking, standing, or sitting. See Tr. 309; Doc. #20-1 at 14.

Like Ms. Cardona's testimony, the observations of the SSA employee provide evidence that plaintiff is sometimes uncomfortable walking, a symptom plaintiff reported to his physicians on many occasions. Much like plaintiff's argument

34

regarding Ms. Cardona's testimony, plaintiff's argument here is unavailing in light of the opinions of plaintiff's treating physicians.

### D. RFC: Lifting

Light work entails "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." SSR 83-10, 1983 WL 31251, at *5-6 (S.S.A. 1983) (emphases added). Sedentary work requires the ability to lift no more than ten pounds. See id. at 5. Plaintiff points to several reports indicating that he could not occasionally lift up to twenty pounds, as required for light duty, and argues that the ALJ's conclusion that plaintiff can occasionally lift up to twenty pounds is not properly supported. See Doc. #18 at 12-14.

While there is some conflicting evidence on this matter, a reviewing court gives deference to the "Commissioner's resolution of conflicting evidence." Cage, 692 F.3d at 122. Plaintiff's primary physician for his shoulder, Dr. Arciero, regularly opined that plaintiff could lift up to twenty pounds, which is consistent with multiple opinions from Dr. Scarangella, plaintiff's other treating orthopedist. See, e.g., Tr. 28-29, 630, 645, 766, 768, 771 (Dr. Arciero); Tr. 28, 380, 384, 405-08, 411 (Dr. Scarangella).

Plaintiff specifically notes that on April 6, 2015, Dr. Scarangella opined that plaintiff could not lift more than ten

pounds, see Tr. 402, and in May 2017, Dr. Arciero opined that plaintiff could only lift fifteen pounds, see Tr. 821. The ALJ concluded that "[t]he claimant additionally retains the ability to lift and carry more than 10 pounds occasionally[,]" Tr. 27, and that the ability to lift twenty pounds was consistent with the record as a whole. Tr. 27-29. The ALJ's conclusion was supported by substantial evidence.

### 1. Dr. Scarangella

With respect to Dr. Scarangella's April 6, 2015, lifting restriction of ten pounds, the ALJ noted that "the record does not show any additional injury or limitation[]" that would explain the downward deviation. Tr. 28. As noted by plaintiff, see Doc. #18 at 13, this is inaccurate. The record does reflect that plaintiff had surgery on his shoulder on February 13, 2015, less than two months before Dr. Scarangella opined that plaintiff could only lift ten pounds. See Tr. 402. The surgery is also referenced in Dr. Scarangella's notes of the same date. See Tr. 375. Those notes document that plaintiff's condition was expected to improve: "Doing very well but still with some pain. Plan: Cleared for light duty work. Reassess in 6 weeks for possible return to full duty work." Tr. 375 (emphasis added). These notes, and temporary restriction to lifting only ten pounds, are also consistent with plaintiff's self-reported status in August 2015 that his shoulder was "pretty much back to

36

full functional capacity[]" six months after the surgery. Tr. 513.

Plaintiff's inability to lift more than ten pounds shortly after surgery does not, alone, constitute a disability. See 42 U.S.C. §423(d)(1)(A). A disability is a condition that is "expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. Thus, because the record demonstrates that plaintiff was restricted to lifting less than ten pounds for a period that continued for less than, and was never expected to continue for more than, twelve months, the restriction does not undermine the ALJ's determination that plaintiff was not disabled during the relevant timeframe, and can perform work at the light-duty level with limited specified restrictions. To the extent that the ALJ erred in merely discounting the restriction as inconsistent with the record as a whole, the error was harmless.

## 2. Dr. Arciero

Plaintiff also raises two claims of error with respect to consideration of Dr. Arciero's May 16, 2017, report (Tr. 821). First, he claims the ALJ did not consider the report. See Doc. #18 at 21. This is inaccurate; the ALJ expressly considered the report. See Tr. 28 (citing 40F [Tr. 821], Dr. Arciero's May 16,

2017 report); Tr. 29 (assigning this and other reports "partial weight").

Second, plaintiff asserts that the ALJ should have adopted the restrictions outlined in the May 16, 2017, report, including that plaintiff could never lift more than fifteen pounds. The Court notes that this was the third report issued by Dr. Arciero within a two-month period. See Tr. 766, 810, 821.

In the first of these three reports, dated March 28, 2017, Dr. Arciero determined that plaintiff was able to occasionally lift up to twenty pounds and occasionally carry up to fifty pounds. See Tr. 766. This determination was consistent with years of prior reports by Dr. Arciero, see, e.g., Tr. 630, 643, 645, 743-44, 766, and was supported by a physical examination and an MRI, see Tr. 766. The record does not contain any basis for the downward deviation in the May 16, 2017, report.

Dr. Arciero also examined plaintiff on April 12, 2017, and imposed no restrictions beyond those imposed on March 28, 2017. See Tr. 810. Furthermore, there is no evidence in the record that the May 16, 2017, report was accompanied by any examination of the plaintiff, and Dr. Arciero provided no specific support for his restrictions. See Tr. 821. In light of the lack of support for this restriction, and its inconsistency with the record as a whole, the ALJ did not err in discounting this slight, one-time, deviation. Therefore, the ALJ's conclusion,

that plaintiff retained the ability to occasionally lift twenty

pounds, was supported by substantial evidence.

### E. Step Five: Plaintiff's Illiteracy

Plaintiff advances two arguments at step five. First,

Plaintiff contends that the ALJ and VE either failed to account

for, or did not properly consider, plaintiff's illiteracy. See

Doc. #18 at 15-16. Second, Plaintiff argues that that a finding

of illiteracy, when combined with a hypothetical determination

that plaintiff could only perform sedentary work, would require

a finding that plaintiff is disabled under Rule 201.17. See Doc.

#18 at 23-24; see also 20 C.F.R. § Pt. 404, Subpt. P, App. 2,

Rule 201.17. As plaintiff has not established that the ALJ erred

in classifying him as capable of performing light work, the

Court does not address the second argument.[14]

The ALJ found that plaintiff "is illiterate and is able to

communicate in English[.]" Tr. 29. The ALJ stated: "Testimony

revealed that the claimant is able to speak and understand

English. He is able to read and write in Spanish, but not in

English." Tr. 30.

> Illiteracy means the inability to read or write. We
> consider someone illiterate if the person cannot read or

---

[14] The Court notes, however, that it appears the VE, on whom the
ALJ relied, agreed with plaintiff's interpretation of this rule,
as the VE stated that if someone with plaintiff's "age,
education, and work experience" were limited to sedentary work,
there would be no jobs in the national economy that such a
person could perform. Tr. 63-64.

> write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal schooling.

20 C.F.R. §§404.1564, 416.964. The Commissioner argues that there is evidence in the record indicating plaintiff's ability to "read with glasses and good ability to follow written instructions[]" and to "write more than his name in English[.]" Doc. #20-1 at 18.

Plaintiff argues that the ALJ erred in considering him to have a high school education, or the equivalent thereof. See Doc. #18 at 15. The Court disagrees with plaintiff's assessment of the VE and ALJ's consideration of his language skills. Plaintiff repeatedly relies on a statement made by the ALJ during the hearing to argue, incorrectly, that the ALJ considered plaintiff's educational level to be equivalent to a high school education.[15] See Tr. 45. If that were true, the ALJ should have applied Rule 202.20 to plaintiff's application. See 20 C.F.R. § Pt. 404, Subpt. P, App. 2, Rule 202.20. However, in the decision, the ALJ instead applied Rule 202.16, see Tr. 30, which applies only to individuals with an educational level of

---

[15] According to plaintiff's counsel, plaintiff "has a seventh grade education and a GED both secured in Puerto Rico. He can in fact speak some English but he is completely illiterate in terms of reading and writing in English." Tr. 44.

"illiterate or unable to communicate in English[,]" 20 C.F.R. §
Pt. 404, Subpt. P, App. 2, Rule 202.16.

Under Rule 202.16, which applies to those who can perform
light duty work, a younger individual, like plaintiff, who is
illiterate, with no previous relevant work experience, is not
necessarily disabled. See id. However, the ALJ did not simply
rely on Rule 202.16. See Tr. 30. The ALJ relied on the testimony
of the VE to assess whether plaintiff's additional restrictions
would alter his disability status. See id. Based on the VE's
testimony, the ALJ found: "[T]here are jobs that exist in
significant numbers in the national economy that [plaintiff] can
perform." Id.

Jobs classified as light work, like all jobs, require
various degrees of skill with the English language. The
Dictionary of Occupational Titles ("DOT") specifies a language
level required for each job it lists. The ALJ considered three
jobs identified by the VE that an individual with plaintiff's
RFC limitations could perform: Parking Lot Attendant, 915.473-
010 (Language level 1),[16] see Dep't of Labor, DOT 929 (4th ed.

---

[16] Language level 1 calls for: "READING: Recognize meaning of
2,500 (two- or three-syllable) words. Read at rate of 95-120
words per minute. Compare similarities and differences between
words and between series of numbers." Dep't of Labor, DOT 1011
(4th ed. 1991).

1991); Fast Food Worker, 311.472-010 (Language level 2),[17] <u>see</u>
<u>id.</u> at 241; and Cashier II, 211.462-010 (Language level 2), <u>see</u>
<u>id.</u> at 183. Plaintiff argues that a finding of illiteracy is
inconsistent with the ability to perform work at any language
level, and that the ALJ committed reversible error by concluding
that plaintiff could perform these jobs. <u>See</u> Doc. 18 at 16-22.

"The DOT lists maximum requirements of occupations as
generally performed, not the range of requirements of a
particular job as it is performed in specific settings." SSR 00-
4P, 2000 WL 1898704, at *2-3 (S.S.A. Dec. 4, 2000). The ALJ has
a duty to elicit a "reasonable explanation for conflict" between
the DOT and a VE's testimony on the record. <u>See</u> <u>id.</u> at 2
(emphasis added). The Second Circuit has recently clarified:

> [T]he Commissioner's duty to identify and resolve
> apparent conflicts between the Dictionary and vocational
> expert testimony is not fulfilled simply by taking the
> vocational expert at his word that his testimony
> comports with the Dictionary when the record reveals an
> apparent conflict. Rather, [SSR 00-4P] places the onus
> on the Commissioner, acting through her ALJs, to
> affirmatively identify any conflicts.

<u>Lockwood v. Comm'r of Soc. Sec. Admin.</u>, No. 17CV2591, 2019 WL
286674, at *5 (2d Cir. Jan. 23, 2019) (citations and quotation

---

[17] Language level 2 calls for: "READING: Passive vocabulary of
5,000-6,000 words. Read at rate of 190-215 words per minute.
Read adventure stories and comic books, looking up unfamiliar
words in dictionary for meaning, spelling, and pronunciation.
Read instructions for assembling model cars and airplanes."
Dep't of Labor, <u>DOT</u> 1011 (4th ed. 1991).

marks omitted). Remand may be warranted in cases where the ALJ does not fully discharge this duty. See id. at *6. However, in light of the entire record, and Second Circuit precedent regarding a VE's treatment of non-exertional limitations, see McIntyre v. Colvin, 758 F.3d 146, 152 (2d Cir. 2014), remand is not justified in this case based on plaintiff's illiteracy.

"While the Commissioner's regulations do indeed take notice of the DOT, federal courts have squarely rejected the contention that an ALJ is bound by the DOT's definitional requirements regarding language ability, which would 'in effect make illiteracy a per se disability[,]'" because every job requires at least a level one language ability. Rivera v. Berryhill, No. 1:15CV00487(MAT), 2018 WL 375846, at *3 (W.D.N.Y. Jan. 11, 2018) (quoting Warf v. Shalala, 844 F. Supp. 285, 289 (W.D. Va. 1994)).

Additionally, an ALJ's failure to expressly incorporate non-exertional limitations into a hypothetical is harmless error if either: (1) evidence demonstrates that plaintiff can engage in the work contemplated by the challenged hypothetical or (2) the hypothetical implicitly accounts for the challenged non-exertional limitation. See McIntyre, 758 F.3d at 152. Each of these rules independently supports rejection of plaintiff's argument.

First, medical records and plaintiff's past work demonstrate some facility with the English language, including the ability to read, follow written instructions, and write more than his name in English. See, e.g., Tr. 283, 285, 303, 307. Plaintiff has held a variety of jobs which were classified by the VE as follows: Farm Worker Field Crop II, 404.687-010 (Language Level 1), see Dep't of Labor, DOT 287 (4th ed. 1991); Assembler (Cook Helper, Pastry), 313.687-010 (Language Level 1), see id. at 244; Classifier (Sorting Laundry), 361.687-014 (Language Level 2), see id. at 261; and Unloading Trucks, 905.687-010 (Language Level 1), see id. at 918. See Tr. 62. No job identified by the VE or ALJ as being currently available to plaintiff would require a higher language level than plaintiff's past work.

Second, although the VE, unlike the ALJ, did not expressly state that he considered plaintiff's educational level to be illiteracy, the VE did implicitly acknowledge it. Specifically, the VE stated that if someone with plaintiff's "age, education, and work experience" was limited to sedentary work, there would be no jobs in the national economy that such a person could perform, consistent with application of Rule 201.17, and

plaintiff's argument.[18] Tr. 63-64. The necessary implication is that the VE considered plaintiff to be illiterate.

The failure of the ALJ to elicit an explanation for any apparent conflict between the VE's testimony and the language level requirements of the DOT was harmless in light of plaintiffs past work, and the VE's implicit acknowledgement of plaintiff's illiteracy.

## VI. CONCLUSION

For the reasons set forth herein, plaintiff's Motion to Reverse or Remand **[Doc. #18]** is **DENIED,** and defendant's Motion for an Order Affirming the Decision of the Commissioner **[Doc. #20]** is **GRANTED.**

SO ORDERED at New Haven, Connecticut, this 11th day of February, 2019.

/s/
HON. SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

---

[18] Additionally, the VE was present by phone during the hearing and therefore heard that plaintiff was testifying with the aid of an interpreter, that plaintiff is both "completely illiterate" and "doesn't read or write[,]" as well as counsel's argument regarding plaintiff's education and potential application of Rule 201.17. Tr. 44-45; see Tr. 41, 61.